UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LISA BOUTILLIER,                                    :
     Plaintiff,                                      :
                                                         :
v.                                                          :                         3:13-cv-01303-WWE
                                                         :
HARTFORD PUBLIC SCHOOLS,                :
     Defendant.                                    :

<u>**MEMORANDUM OF DECISION ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**</u>

In this action, plaintiff Lisa Boutillier alleges that defendant Hartford Public Schools

discriminated and retaliated against her based on her sexual orientation and physical disability in

violation of the Connecticut Fair Employment Practices Act ("CFEPA") (Counts I-III);

discriminated against her based on her sexual orientation in violation of Title VII (Count IV);

discriminated against her based on her disability in violation of the Americans with Disabilities

Act, as amended (Count V); and constructively discharged her in violation of Connecticut law

(Count VI).

Defendant has moved for summary judgment on all claims.  For the following reasons,

defendant's motion will be granted in part and denied in part.

**BACKGROUND**

The following facts are gleaned from the parties' statements of fact, affidavits, deposition

transcripts, and other exhibit documentation.

Plaintiff commenced employment with the Hartford Board of Education at the Noah

Webster Microsociety Magnet School ("Noah Webster") at the start of the 2006-2007 school

year.  She was recommended for hire to a sixth grade mathematics position by then principal Dee

Cole.  Within a few days of starting, plaintiff was moved to a fourth grade position.  Days later,

plaintiff was again moved to a kindergarten position, where she taught during the 2006-2007 school year. Cole was plaintiff's direct supervisor.

Cole also recommended plaintiff's spouse, Ginene Branch, for hire at Noah Webster.

On the last day of staff development before the 2006-2007 school year began, Cole informed plaintiff that Noah Webster was overstaffed. Cole gave Branch and plaintiff the choice as to which one wanted to stay at Noah Webster and which one wanted to move to a fourth grade science position at Hooker Elementary School. Plaintiff contends that Cole called plaintiff and Branch into her office with both of their resumes in front of her and saw that they went to the same art school, moved together, and taught at the same schools for almost 30 years, implicating Cole's knowledge of their relationship. Cole admits that it was unusual to allow two teachers to decide between themselves who would stay and who would go. Moreover, plaintiff asserts that it was well known among staff and parents at Noah Webster that she was gay and that Branch and plaintiff were a couple. When asked at deposition about knowledge of plaintiff's relationship with Branch, Cole responded: "I never learned that. I didn't know that. That was never part of any knowledge that I knew, nor did I care to know." However, vice principal Vernice Duke, who worked alongside Cole for three years, stated in October 2012 that, "[plaintiff's] relationship with Ginene is not a problem and is known to everyone at the school. This has not been an issue with her peers nor with administration."

Branch chose to move to Hooker, and plaintiff stayed at Noah Webster. Plaintiff asserts that Cole told Branch that she would have first rights to return to Noah Webster when a position became available, but Cole maintains that she merely told Branch that she was welcome to apply for future available positions.

Plaintiff spoke to her union representative, Sue Frazer, concerned that she had been "outed" as gay by another teacher.  Plaintiff asserts that Frazer warned her to 'watch her back.'

Shortly after Branch left the school, a position opened at Noah Webster.  When plaintiff approached Cole about the possibility of Branch filling the position, plaintiff alleges that Cole became very angry and stated, "Don't you tell me who to hire."   Cole disputes making an agreement for Branch's return and testified, "That's not how it works anyway."  Branch never returned to Noah Webster.

Plaintiff contends that Cole knew she was gay at the start of the 2006-2007 school year. At the end of that year, Cole rated plaintiff as "excellent" in her evaluation.  Nevertheless, plaintiff maintains that Cole's treatment of her caused her to stop speaking at staff meetings. Another teacher's statement, taken as part of a subsequent internal investigation, corroborates plaintiff's perception of abrupt treatment at staff meetings.

For the 2007-2008 school year, plaintiff moved to teaching first grade.  Plaintiff questioned the placement of a difficult student in her classroom because she had endured a similarly difficult student in her classroom the year before.  Plaintiff asserts that Cole became angry and berated plaintiff in front of other staff.

Plaintiff alleges that when parents were upset that the bulk of behavioral problem students were placed in plaintiff's classroom, Cole accused her of improperly communicating to parents about other students' behavioral problems.  Plaintiff denied sharing information and reported that the concerned parents were "room mothers" who were regularly present in the classroom.  Cole allegedly announced to plaintiff that, "If you do anything that I consider to be unprofessional, it will be grounds for immediate dismissal."

3

At a meeting among Cole, plaintiff, and union representative Sue Frazer, Cole allegedly stated, "[Plaintiff] is an outstanding educator and outstanding first grade teacher.  This is personal."

Cole rated plaintiff as "competent," the second highest rating for the 2007-2008 and 2008-2009 school years.

During the 2008-2009 school year, plaintiff was given a verbal warning for sharing confidential student information with parents; plaintiff denies doing so and testified that she was falsely accused.  Plaintiff alleges that in November 2008, Cole screamed at plaintiff and refused to hear her explanation after an incident involving a student who repeatedly hit plaintiff, leaving her badly bruised.  Cole wrote up a warning document about the student, but plaintiff asserts that she did not see the document until she reviewed her personnel file years later.

The parties disagree about how many times plaintiff applied for alternative positions during her tenure.  She was not hired for any alternative positions to which she applied.

Vernice Duke assumed the part-time assistant principal position and became plaintiff's evaluator at Noah Webster at the start of the 2009-2010 school year.  Duke evaluated plaintiff as "competent" for the 2009-2010 school year and noted no areas of weakness in plaintiff's teaching.  The evaluation did designate several areas for growth and improvement.

Plaintiff alleges that during the summer of 2010, she and Branch encountered Duke, who upon seeing their wedding rings made a "nasty" face, indicative of disapproval.  In response to this accusation, Duke stated that, "I had just gotten back from knee surgery.  If I had any facial expressions not to their liking, it could have been from being in pain after having a knee replacement.  I don't even think that to this date [October 23, 2012], I have even seen their

wedding bands."

Defendant asserts that plaintiff was awarded tenure as of August 28, 2010, but plaintiff responds that despite the regular practice of notifying teachers in writing upon granting of tenure, she was never notified in writing and has no information on how or when tenure was awarded.

Duke rated plaintiff as "competent" for the 2010-2011 school year.

Plaintiff asserts that during a performance evaluation meeting she confronted and accused Duke of discriminating against her because of her sexual orientation.  Duke denies this.  Duke's statement, taken as part of the district's internal investigation, provides, "I have never had a conversation about [plaintiff's] sexual preferences with plaintiff."  Yet, remarkably, as part of that same statement, Duke provides:

> [Plaintiff] said to me that she usually does not tell people about her situation.  Then she went on to explain that her significant other was a female.  This conversation took place during her second year of working with me.  I said to her that this had nothing to do with the performance of her job and that she was entitled to a private life just [like] everyone else.  To go even further, [plaintiff] introduced me to [her spouse, Branch,] at some point.

In August 2011, prior to the start of the school year, plaintiff suffered a medical issue that resulted in absence for the first half of the school year.  Plaintiff contends that after notifying the district of her need for treatment for an embolism and a hysterectomy, Cole misled parents by telling them that plaintiff would not be returning to teach at Noah Webster, citing a "personnel matter" rather than informing the parents that plaintiff was on approved medical leave.  A parent of one of plaintiff's students submitted an affidavit indicating the same.  The parent was surprised to subsequently learn that plaintiff was ill, as from the parent's perspective, Cole had implied that there was a "disciplinary reason" for plaintiff's absence.

During her absence, plaintiff alleges that Duke called her at home, demanding to know her medical status and what medications she was taking.  Plaintiff proffers that after she complained to Elaine Bonfiglio in human resources, Duke's calls stopped, but plaintiff maintains that Duke chastised her about her plans to return to Noah Webster with the risk of falling ill in front of the students.

Despite the fact that plaintiff's doctor only once extended plaintiff's medical leave, Cole complained at deposition that "plaintiff was coming back several times and didn't come back. . . . Again, coming back, not coming back, coming back, not coming back."

Teacher Jen Wight was reassigned from her resource position to take over plaintiff's classroom in plaintiff's absence.  Plaintiff returned to work in January 2012.  As some point prior to plaintiff's return, Wight also went on medical leave.  Plaintiff protests that despite her seniority and despite the fact that the class was originally assigned to her, Wight was given priority upon return in January and remained in the first grade position for the remainder of the 2011-2012 school year.  Plaintiff was assigned a resource reading position for first and second grade students.  Plaintiff testified that upon her return, Cole's assistant, Iris Febles-Martinez, told plaintiff that she had been "replaced" by Cole and was therefore not entitled to receive teacher dollar cards and teaching supplies.

Plaintiff contends that the resource reading position was created upon her return; it required her to create new curriculum and travel around the school even though plaintiff's doctor had notified Cole in writing that plaintiff "has been suffering from profound fatigue and decreased activity tolerance (ex: climbing one flight of stairs can cause her shortness of breath which requires a few minutes to recover)."  The letter continues: "Though her medical conditions

are gradually stabilizing, her activity level and endurance are very much limited but certainly improving–slowly."

On February 7, 2012, after an allegedly heated meeting with Duke, which concluded with Duke yelling at plaintiff to get her backpack out of Duke's sight, plaintiff collapsed to the ground and was taken by ambulance to the hospital.

Plaintiff requested and received 20 paid sick days from the teacher sick bank. On her request for sick bank leave she stated that she had collapsed due to "severe fatigue, exhaustion and syncope ... [which was] the direct result of the pulmonary embolism that I had developed in August 2011."

Plaintiff returned to work on March 12, 2012, in accordance with her medical clearance.

Upon plaintiff's return to work on March 12, 2012, she was placed in a kindergarten classroom to cover for a teacher who was absent due to injury.

On May 25, 2012, plaintiff had car trouble and called out for a personal day. Plaintiff contends that Duke called her at home demanding that she report to work. Plaintiff rented a car and drove to school. Plaintiff reported Duke's call to her union representative. Duke asserts that she called plaintiff at home out of mere courtesy to prevent plaintiff from missing out on her paycheck.

On May 30, 2012, plaintiff requested permission from Duke to leave school grounds to run an errand at a nearby store. Duke granted plaintiff permission but reminded her of her obligation to "sign out." A third party, Ms. Carreiro, was in Duke's office at the time and provided a statement about the incident, describing Duke's manner as abrupt with plaintiff to an extent that Carreiro became "very uncomfortable." Carreiro also reported that Duke's

unprofessional treatment of plaintiff was unique.  The school's executive assistant later informed

Duke that plaintiff neglected to sign out.  Plaintiff testified that she decided to forgo the errand,

as the school cafeteria stocked the item she sought.  Nevertheless, Cole and Duke met with

plaintiff that same afternoon.  Plaintiff asserts that upon arrival to Cole's office, she was

informed that she was to be disciplined for failure to sign out before leaving school grounds.  She

alleges that after she attempted to explain that she did not sign out because she did not leave the

building, Cole and Duke began screaming at her.  When plaintiff asked for a union

representative, plaintiff contends that she was told to shut up and sit down.  Defendant asserts

that the primary purpose of the meeting was to inform plaintiff that she would be assigned, as

requested, to teach second grade.

 Plaintiff became ill after the meeting.  The school nurse contacted Duke to inform her of

the medical emergency and called 911.  The paramedics along with Duke and Cole met plaintiff

in the school gymnasium.  Plaintiff was transported from the school by ambulance.  She did not

return for the final weeks of the 2011-2012 school year.

 Plaintiff testified that neither her sister nor her spouse were informed of her medical

emergency.  Branch, plaintiff's spouse, affirmed the lack of notification.  Nevertheless, Duke

reported that "family members were contacted."  None have been identified.  Cole claims that

she purposefully waited for Branch to arrive at school after plaintiff was taken by the ambulance

so that Branch could collect plaintiff's belongings, but no one asserts that Branch was ever

summoned.  Moreover, plaintiff contends that she was not notified by the school that she was

apparently ineligible for health insurance benefits because of FMLA hours-worked requirements.

 After learning that her physician had been told that she was no longer employed and had

no health insurance, plaintiff went to the human resources office, where she asserts that she was handed a letter explaining that her health insurance would expire on July 1, 2012.  Branch then demanded that the district add plaintiff to her health benefits as her spouse.  This request was granted.  Plaintiff contends that defendant has failed to produce records as to its policy on eliminating health insurance for teachers out on medical leave.

Plaintiff's primary care physician, Rashma Jhunja, MD, and psychologist, Marc J. Mann, PhD, began notifying the school district of the negative impacts on plaintiff's health due to the allegedly hostile work environment created by Cole and Duke.  No evidence has been produced to suggest that the school district investigated the reports of hostile work environment as described by Dr. Jhunja or Dr. Mann.

On June 21, 2012, subsequent to receiving a medical note for plaintiff's leave of absence, the district sent plaintiff a letter asking whether she was claiming to have a disability under the ADA or Connecticut law.  The same day, defendant sent plaintiff a copy of the harassment policy and a harassment report form.

On July 17, 2012,  plaintiff filed an internal harassment complaint against Duke and Cole.

On July 19, 2012, the district received medical documentation which stated: "Though Lisa has had decreased endurance and has been limited in her activities through her prolonged recovery period, as of the present time she is medically cleared to resume her work in full capacity with her baseline level of activity and endurance."

Plaintiff met with a district investigator regarding her complaint, where she read a prepared statement, but she declined to continue meeting with the investigator after retaining counsel.  Plaintiff's counsel indicated to the district by letter dated September 12, 2012, that

plaintiff had fulfilled her obligations under the district's Harassment Policy.

On September 21, 2012, plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities.

The district's investigator took statements from other teachers at Noah Webster, which indicated that Cole and Duke treated plaintiff with greater antagonism as compared to other teachers without apparent justification.  Moreover, Sue Frazier, as part of her statement, offered that: "We have had other gay staff members leave our school during Ms. Coles' tenure as our principal.  At one time or another, ALL of them expressed to me, as their building rep, that they felt that Ms. Cole treated them unfairly." (emphasis original).

On March 5, 2013, after completing its investigation, the Central Harassment Team concluded that it could not "substantiate harassment" and so notified the parties.

Cole left Noah Webster at the end of the 2011-2012 school year when she was promoted to Executive Director of Early Literacy.  Plaintiff had no further contact with Cole.

Jay Mihalko became principal of Noah Webster at the start of the 2012-2013 school year, during which plaintiff was assigned to teach second grade.  Mihalko also became plaintiff's evaluator.

Despite filing complaints against Cole and Duke, and despite the fact that Mihalko, not Duke, was plaintiff's evaluator and supervisor, plaintiff contends that Duke continued to publicly humiliate her by reprimanding her in front of parents.  Plaintiff submitted an email dated November 21, 2012, from a parent concerning one such incident.  It states in relevant part: "I saw you in the lobby getting 'reprimanded?' from Duke- Oh boy! Give me a break..."

In July 2013, Mihalko requested that human resources transfer plaintiff from a second

10

grade position to a first grade position, but plaintiff denies that she was ever so informed; she points out that defendant's evidence of the transfer was neither produced in discovery nor produced when defendant contested plaintiff's unemployment benefits claim.  Plaintiff alleges that she learned of the transfer from an email from Duke to the entire first grade team and from other teachers' emails, rather than from written notice as required by the union contract.

Plaintiff asserts that she learned through Duke and other teachers' emails that she would be under Duke's supervision as part of Duke's team.  Moreover, plaintiff's new classroom would be parallel from Duke's office.  Plaintiff asserts that she contacted union representative Joshua Hall upon learning that she was being "welcomed back to Duke's team," but that Hall informed her that he did not think he could stop the transfer.  Plaintiff contends that her therapist advised her that she should not continue to work in such a hostile environment.

On August 19, 2013, plaintiff resigned her employment with the district.  Plaintiff neither spoke with Mihalko nor requested a change to a different school building prior to her resignation. She contends that, in consultation with her medical providers and union representatives, a request for change in buildings was futile based on her prior failed attempts to transfer, the proximity of the upcoming school year, and the apparent finality of the decision to place plaintiff in a first grade classroom under the supervision of Duke – despite plaintiff's formal complaint against Duke.

Plaintiff applied for unemployment compensation.  On September 19, 2013, the administrator of Connecticut's Unemployment Compensation Department ruled that plaintiff's separation from employment did not disqualify her for unemployment compensation because plaintiff had quit with good cause attributable to the employer.  However, the district appealed

the administrator's determination on September 27, 2013, contending that plaintiff had quit

without good cause and should be denied compensation.  The appeals referee concluded:

> The claimant testified that she resigned rather than accept the change in assignment
> because, the assignment put her under the direct report of vice principal, [Duke].
> Testimony from both parties confirm that as of the date of the change of assignment,
> the claimant had pending litigation involving [Duke], that involved incidents in the
> course of employment.  In addition, the claimant suffers from extreme stress and
> anxiety related to her dealings with [Duke].  Medical documentation from physician,
> Rashma Jhunja, states that it was recommended that the claimant not return to that
> working environment, due to the stress and anxiety.  The evidence establishes that
> the change in conditions had an adverse effect on the claimant.  A remedy was futile
> for the claimant because the change in position was done without prior notice to
> allow for an alternative to be explored.  The record reveals that the claimant became
> aware of the change in position just a few weeks prior to the start of the school year.

On November 4, 2013, the Employment Security Appeals Division affirmed the administrator's

determination to award benefits and dismissed the district's appeal.

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any

material fact and it is clear that the moving party is entitled to judgment as a matter of law.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "Only when reasonable minds could not

differ as to the import of the evidence is summary judgment proper."  Bryant v. Maffucci, 923

F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

The burden is on the moving party to demonstrate the absence of any material factual

issue genuinely in dispute.  American International Group, Inc. v. London American International

Corp., 664 F.2d 348, 351 (2d Cir. 1981).  In determining whether a genuine factual issue exists,

the court must resolve all ambiguities and draw all reasonable inferences against the moving

party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323.  If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Anderson, 477 U.S. at 249.

The Court will address defendant's various summary judgment arguments in the order they were set forth in the motion papers.

**A.  Sexual Orientation Discrimination under Title VII**

Plaintiff asserts that defendant violated her rights under Title VII by discriminating against her and sexually stereotyping her during her employment.  Defendant argues that sexual orientation is not a protected category under Title VII.

Title VII protects a limited class of persons from discrimination.  Protection is limited to individuals who are discriminated against on the basis of race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(1),(2); Kiley v. American Soc. for Prevention of Cruelty to Animals, 296 Fed. Appx. 107, 109 (2d Cir. 2008).

"It is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Sandifer v. U.S. Steel Corp., 134 S. Ct. 870, 876 (2014).

Early interpretations of Title VII's sex discrimination provisions reached illogical conclusions based on a supposed traditional concept of discrimination, which, for example, determined that discrimination based on pregnancy was not discrimination based on sex.  See General Elec. Co. V. Gilbert, 429 U.S. 125, 145-46 (1976).  In 1978, Congress passed the

Pregnancy Discrimination Act to overturn <u>Gilbert</u>, but the soundness of <u>Gilbert</u>'s reasoning, or lack thereof, did not rise and fall based on Congress's efforts.  That is, <u>Gilbert</u> and other similar decisions that imposed incongruous traditional norms were misguided in their interpretations regardless of whether Congress had been able to overrule them.  <u>See, e.g.</u>, <u>Barnes v. Train</u>, 1974 WL 10628, *1 (D.D.C. August 9, 1974) ("The substance of plaintiff's complaint is that she was discriminated against, not because she was a woman, but because she refused to engage in a sexual affair with her supervisor."), <u>rev'd</u> <u>sub nom.</u> <u>Barnes v. Costle</u>, 561 F.2d 983, 990 (D.C. Cir. 1977) ("Put another way, she became the target of her superior's sexual desires because she was a woman, and was asked to bow to his demands as the price for holding her job."). Decisions like the district court's in <u>Barnes</u> and the Supreme Court's in <u>Gilbert</u>, were discordant not because they chose what are now unpopular normative judgments, but because they failed to take the ordinary meaning of the Act's text to its logical conclusions.  In his dissent in <u>Gilbert</u>, Justice Brennan illuminated the fallacy of the majority's holding when he wrote: "[T]he company has devised a policy that, but for pregnancy, offers protection for all risks, even those that are 'unique to' men or heavily male dominated."  <u>Gilbert</u>, 429 U.S. at 160.  The converse of the majority's decision, and equally absurd, would be to hold that an exclusion in coverage for prostate cancer does not discriminate against men based on sex.  Such conclusions represent a fundamental failure of ordinary interpretation.

The Second Circuit has reasoned that although the legislative history on whether sexual orientation should be included in the category of sex is "scant," because numerous bills have attempted to extend Title VII protection to sexual orientation, Congress did not intend to include sexual orientation protections in Title VII's current form.  <u>See</u> <u>Kiley</u>, 296 Fed. Appx. at 109.  But

14

under this rationale, had Congress failed to amend Title VII in 1978, pregnancy based

discrimination (or the hypothetical prostate cancer based discrimination) would not constitute

discrimination based on sex.  Such reasoning is unpersuasive because Congress's intent as it

exists now or existed in the recent past is not an accurate gauge of its intent as it existed over

fifty years ago.  Indeed, when Congress amended Title VII in 1978 to overturn Gilbert, the House

Report stated: "It is the Committee's view that the dissenting Justices correctly interpreted the

Act."  H.R. Rep. No. 95-948, 95th Cong., 2d Sess. 2 (1978), Legislative History of the Pregnancy

Discrimination Act of 1978; see also Newport News Shipbuilding and Dry Dock Co. v.

E.E.O.C., 462 U.S. 669, 679 (1983) ("Proponents of the bill repeatedly emphasized that the

Supreme Court had erroneously interpreted Congressional intent and that amending legislation

was necessary to reestablish the principles of Title VII law as they had been understood prior to

the Gilbert decision.").

Acknowledging that the legislative history on whether sexual orientation should be

included in the category of sex under Title VII is slight, it is difficult to glean the absence of prior

intention merely from subsequent efforts by Congress to reenforce statutory civil rights

protections.[1]  The failed efforts by Congress to explicitly include sexual orientation as a new,

stand alone category of protected individuals under Title VII does not mandate the conclusion

that sexual orientation based discrimination is not covered by the existing prohibition on sex

based discrimination.

---

[1]"Admittedly, we have little legislative history to guide us in interpreting the Act's prohibition against discrimination based on sex."  Simonton v. Runyon, 232 F.3d 33, 35 (2d Cir. 2000).

The Supreme Court has warned against such reliance:

[S]ubsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress. It is a particularly dangerous ground on which to rest an interpretation of a prior statute when it concerns, as it does here, a proposal that does not become law.  Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, *including the inference that the existing legislation already incorporated the offered change.*

Pension Ben. Guar. Corp. v. LTV Corp., 496 U.S. 633, 650 (1990) (emphasis added, internal quotation and citation omitted).

Moreover, straightforward statutory interpretation and logic dictate that sexual orientation cannot be extricated from sex; the two are necessarily intertwined in a manner that, when viewed under the Title VII paradigm set forth by the Supreme Court, place sexual orientation discrimination within the penumbra of sex discrimination.

In 1976, the Supreme Court held: "When Congress makes it unlawful for an employer to discriminate because of sex without further explanation of its meaning, we should not readily infer that it meant something different from what the concept of discrimination has traditionally meant[.]" Gilbert, 429 U.S. at 145.  However, "[w]hen Congress amended Title VII in 1978, it unambiguously expressed its disapproval of both the holding and the reasoning of the Court in the Gilbert decision."  Newport News 462 U.S. at 678.

In Newport News, the petitioner's plan provided pregnancy related benefits to female employees but provided less favorable pregnancy benefits for spouses of male employees.  462 U.S. at 671-72.  The Supreme Court held that: "Under the proper test petitioner's plan is unlawful, because the protection it affords to married male employees is less comprehensive than

16

the protection it affords to married female employees." Id. at 676.  The proper, straightforward

test asks not whether the discrimination falls within the concept of what discrimination has

traditionally meant, but whether the employer has discriminated on the basis of sex.  See id.

Presuming that an employer has discriminated against an individual with respect to

compensation, terms, conditions, or privileges of employment, because of such individual's

sexual orientation, that employer has necessarily considered both the sex of the partner *and* the

sex of the individual.  Under the proper test as enunciated in Newport News, such treatment

would be unlawful because, for example, the protection afforded to female employees with

female partners is less comprehensive than the protection afforded to male employees with

female partners.

Nevertheless, based on "our well-settled precedent that 'sex' refers to membership in a

class delineated by gender [not sexual orientation,]" the Second Circuit in Simonton v. Runyon

held that Title VII does not proscribe discrimination because of sexual orientation.  232 F.3d 33,

36 (2000).  But since Simonton, the Second Circuit has empowered employees to bring virtually

identical associational Title VII claims in the context of race discrimination.  See Holcomb v.

Iona College, 521 F.3d 130, 139 (2d Cir. 2008).

> The reason is simple: where an employee is subjected to adverse action because an
> employer disapproves of interracial association, the employee suffers discrimination
> because of the employee's *own* race. All the district judges in this circuit to consider
> the question, including the district court in this case, have reached that conclusion.
> Holcomb, 2006 WL 1982764 at *9; Rosenblatt v. Bivona & Cohen, P.C., 946
> F.Supp. 298, 300(S.D.N.Y.1996) ("Plaintiff has alleged discrimination as a result of
> his marriage to a black woman. Had he been black, his marriage would not have been
> interracial. Therefore, inherent in his complaint is the assertion that he has suffered
> racial discrimination based on his own race."); Whitney v. Greater N.Y. Corp. of
> Seventh–Day Adventists, 401 F.Supp. 1363, 1366 (S.D.N.Y.1975). The Fifth, Sixth,
> and Eleventh Circuits agree. Deffenbaugh–Williams v. Wal–Mart Stores, Inc., 156

F.3d 581, 589 (5th Cir.1998), vacated in part on other grounds by Williams v. Wal–Mart Stores, Inc., 182 F.3d 333 (5th Cir.1999) ("Title VII prohibits discrimination in employment premised on an interracial relationship."); Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick & GMC Trucks, Inc., 173 F.3d 988, 994–95 (6th Cir.1999) (holding Title VII applicable to allegation that employee suffered discrimination because he had a biracial daughter); Parr v. Woodmen of the World Life Ins. Co., 791 F.2d 888, 892 (11th Cir.1986) ("Where a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of his race.").

Accordingly, we find that Holcomb, in claiming that he suffered an adverse employment action because of his interracial marriage, has alleged discrimination as a result of his membership in a protected class under Title VII.

Id. at 139.

The logic is inescapable: If interracial association discrimination is held to be "because of the employee's *own* race," so ought sexual orientation discrimination be held to be because of the employee's *own* sex.  Holcomb and Simonton are not legitimately distinguishable.  If Title VII protects individuals who are discriminated against on the basis of race because of interracial association (it does), it should similarly protect individuals who are discriminated against on the basis of sex because of sexual orientation – which could otherwise be named "intrasexual association."

As Holcomb and Simonton cannot be legitimately reconciled, given that Holcomb is more recent, more consistent with general principles of statutory construction, and more agreeable to reason, the Court finds that Title VII protects individuals who are discriminated against on the basis of sex because of their sexual orientation.

The Supreme Court's holding in Price Waterhouse v. Hopkins bolsters the Court's position.  See 490 U.S. 228, 251 (1989).  There, the Court held that sex stereotyping could constitute discrimination based on sex:

18

> As for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for in forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.

Id.  Indeed, stereotypes concerning sexual orientation are probably the most prominent of all sex related stereotypes, which can lead to discrimination based on what the Second Circuit refers to interchangeably as gender non-conformity.  "That is, individual employees who face adverse employment actions as a result of their employer's animus toward their exhibition of behavior considered to be stereotypically inappropriate for their gender may have a claim under Title VII." Dawson v. Bumble & Bumble, 398 F.3d 211, 218 (2d Cir. 2005).

Nevertheless, the Second Circuit has maintained the position that although, based on Price Waterhouse, a plaintiff may properly allege discrimination based on sex stereotyping, "a plaintiff may not use a gender stereotyping claim to bootstrap protection for sexual orientation into Title VII."  Kiley, 296 Fed. Appx. at 107.  In other words, sexual orientation discrimination must be excluded from the equation when determining whether allegations or evidence of gender non-conformity discrimination are sufficient.  Such balancing is inherently unmanageable, as homosexuality is the ultimate gender non-conformity, the prototypical sex stereotyping animus.

The Seventh Circuit recently highlighted the inconsistent state of the law:

> The cases as they stand do, however, create a paradoxical legal landscape in which a person can be married on Saturday and then fired on Monday for just that act. For although federal law now guarantees anyone the right to marry another person of the same gender, Title VII, to the extent it does not reach sexual orientation discrimination, also allows employers to fire that employee for doing so. From an employee's perspective, the right to marriage might not feel like a real right if she can be fired for exercising it. Many citizens would be surprised to learn that under federal law any private employer can summon an employee into his office and state, "You are a hard-working employee and have added much value to my company, but I am firing you because you are gay."

Hively v. Ivy Tech Community College, South Bend, 830 F.3d 698, 714 (7th Cir. 2016) (reh'g

granted).

Similarly paradoxical is the upshot of the proscription against "bootstrapping" under the

light of Price Waterhouse.  Essentially, employers are prohibited from discriminating against

employees for exhibiting stereotypical gay behavior, yet, at the same time, employers are free to

discriminate against employees for actually being gay.

> Moreover, the truth of this scenario would also apply to perceived sexual orientation. And so, for example, an employer who merely has a hunch that an employee is gay can terminate that employee for being gay whether or not she actually is.  And even if the employer is wrong about the sexual orientation of the non-gay employee, the employee has no recourse under Title VII as the discharge still would be based on sexual orientation.

Hively, 830 F.3d at 714-15.

Again, reconciliation of Simonton and Price Waterhouse produces untenable results. This

reenforces the Court's decision to follow the lead of the Second Circuit's Holcomb opinion by

interpreting the ordinary meaning of sex under Title VII to include sexual orientation, thereby

obviating the need to parse sexuality from gender norms.[2]  The EEOC has adopted this view as

part of its Strategic Enforcement Plan.  See Robyn Dupont and Nichole Davis, Gender Identity

and Sexual Orientation Coverage under Title VII, The Digest of Equal Employment Opportunity

Law, Volume XXVI, No. 1 (August 2015).[3]  The Seventh Circuit agreed to a full rehearing in

---

[2]"When utilized by an avowedly homosexual plaintiff, however, gender stereotyping claims can easily present problems for an adjudicator. This is for the simple reason that stereotypical notions about how men and women should behave will often necessarily blur into ideas about heterosexuality and homosexuality."  Dawson, 398 F.3d at 218.

[3]https://www.eeoc.gov/federal/digest/xxvi-1.cfm#article

Hively, and the Second Circuit is likely to provide guidance on its position shortly in the case of Christiansen v. Omnicom Group, Inc., 167 F. Supp. 3d 598 (S.D.N.Y. 2016). That decision may ultimately decide the fate of plaintiff's Title VII claims. In the meantime, summary judgment will be denied. Plaintiff has adequately established a right to protection under Title VII.

**B. Hostile Work Environment under Title VII and the CFEPA**

The analysis of discrimination and retaliation claims under the CFEPA is the same as under Title VII. Kaytor v. Electric Boat Corp., 609 F.3d 537, 556 (2d Cir. 2010).

Plaintiff asserts that she has sufficient evidence to establish that (1) she was subjected to offensive acts or statements based on her protected category; (2) the acts or statements were unwelcome and had not been invited or solicited directly or indirectly by her own acts or statements; (3) the acts or statements resulted in a work environment that was so permeated with discriminatory intimidation, ridicule or insult that those acts or statements materially altered the condition of her employment; (4) a reasonable person would have found the workplace to be hostile or abusive; and (5) that she believed the workplace to be hostile or abusive. See Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993); Alfano v. Costello, 294 F. 3d 365 (2d Cir. 2002).

Defendant argues that plaintiff cannot establish the first, third, and fourth of the above requirements.

Resolving all ambiguities and drawing all reasonable inferences against defendant, whether plaintiff was subjected to offensive acts or statements based on her sex is a material factual issue genuinely in dispute. Plaintiff's testimony indicates that hostility was responsive to Cole and Duke learning that plaintiff was a gay woman. Plaintiff complained that she was targeted by Cole and Duke because she was gay. There is evidence that former gay teachers had

made similar complaints to a union representative.  Other teachers and staff witnessed

unprovoked negative treatment of plaintiff (Frazer, Carreiro, Nance, Gale).  Parents also

observed poor treatment (Smith, Cieri).  Finally, plaintiff's primary care physician and

psychologist alerted school administrators to the damage allegedly inflicted upon plaintiff based

on the hostile work environment.  A reasonable jury could find that Cole's and Duke's testimony

about their knowledge of plaintiff's sexual orientation undermines their credibility.

In order to determine whether an environment is hostile or abusive, a court must look at

all of the circumstances, including, (1) the frequency of the discriminatory conduct; (2) its

severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance;

and (4) whether it unreasonably interferes with an employee's work performance.  Harris v.

Forklift Systems, Inc., 510 U.S. 17, 23 (1993).  Title VII is violated when the workplace is

permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working

environment.  Id. at 21.

Whether alleged discriminatory intimidation materially altered the condition of plaintiff's

employment is also genuinely in dispute.  Plaintiff maintains that defendant's hostile conduct

was frequent and severe.  Indeed, plaintiff twice collapsed at school and required transport by

ambulance to the hospital.  Defendant apparently failed to notify plaintiff's wife and family of

those emergencies, despite requests for such notice.  Plaintiff missed time from work, including

time that was unpaid.  After returning from medical leave, defendant assigned plaintiff to a newly

created position that required her to walk about the school building, whose elevator was

inoperable – this despite doctors notes that plaintiff was suffering from profound fatigue and

decreased activity tolerance.  Finally, plaintiff contends that her doctors' notes concerning a

hostile work environment were essentially ignored by defendant. Genuine issues of material fact

exist as to whether defendant adequately investigated and corrected plaintiff's reports of sexual

harassment by supervisors.

The Court also finds a triable issue of fact as to whether a reasonable person would have

found the workplace to be hostile or abusive.

**C.  Disparate Treatment Based on Sexual Orientation under Title VII and the
CFEPA**

Defendant argues that plaintiff has failed to establish any legally cognizable adverse

employment actions that would establish disparate treatment and that she cannot demonstrate that

defendant's legitimate business reasons were pretext for discrimination.  Defendant further

contends that plaintiff failed to exhaust her administrative remedies, as she failed to file a

complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO")

within the required time frame.

Plaintiff responds that "[t]he issuance of a right to sue letter, although not constituting an

open license to litigate any claim of discrimination against an employer, does permit a court to

consider claims of discrimination reasonably related to the allegations in the complaint filed with

the EEOC, including new acts occurring during the pendency of the charge before the EEOC."

Kirkland v. Buffalo Bd. of Ed., 622 F.2d 1066, 1068 (2d Cir. 1980).  Resolving all ambiguities in

plaintiff's favor, the Court finds that plaintiff has proffered sufficient evidence of a continuing

course of conduct reasonably related to the allegations in plaintiff's complaint to the EEOC.

Essentially, plaintiff contends that defendant continually discriminated against her based on her

sexual orientation until she was forced to resign, at the advice of her doctors.

Plaintiff's complaint alleges that she was constructively discharged. "Adverse employment actions include discharge from employment. Such a discharge may be either an actual termination of the plaintiff's employment by the employer or a constructive discharge." Fitzgerald v. Henderson, 251 F.3d 345, 357 (2d Cir. 2001).

An employee is constructively discharged where an employer intentionally creates a work atmosphere so intolerable that she is forced to quit involuntarily. Petrosino v. Bell Atlantic, 385 F.3d 210, 229 (2d Cir. 2004). The Second Circuit has not insisted on proof of specific intent by employers, but a plaintiff must demonstrate that the employer's actions were deliberate. Id. at 229-30. An employee must also demonstrate that the work conditions were intolerable. Id.

Here, Connecticut's Unemployment Compensation Department ruled that plaintiff had quit with good cause attributable to the employer. Whether defendant's actions were deliberate is an issue of material fact genuinely in dispute, and will depend significantly on credibility determinations. For example, evidence that defendant told parents, without basis, that plaintiff would not be returning to Noah Webster could be indicative of deliberate actions aimed at her permanent removal.

"Intolerable working conditions is based on an objective standard of whether a reasonable person in the employee's position would have felt compelled to resign. An employee's subjective opinion that his or her working conditions are intolerable is not sufficient to establish constructive discharge." Murphy v. Beavex, Inc., 544 F. Supp.2d 139, 153 (D. Conn. 2008).

Here, plaintiff received medical recommendation from her physician that she not return to her working environment at Noah Webster due to the adverse health effects of the stress and

24

anxiety created by defendant's alleged hostility.  Under an objective standard,  plaintiff has

sufficiently created a triable issue as to whether her work conditions were intolerable.

Finally, the Court finds that plaintiff has presented sufficient evidence to allow a jury to

determine whether defendant's supposed legitimate business reasons were pretext for

discrimination.

### D.  Constructive Discharge Claim

Defendant's complaint lists "constructive discharge" as a stand alone claim (Count VI).

Defendant argues that constructive discharge is not a legally cognizable claim on its own, but

rather a legal fiction under which an employee's voluntary resignation may be deemed a

termination by the employer.

Plaintiff responds that this Court has already ruled that Plaintiff's Constructive Discharge

claim may be construed as a claim for wrongful termination in violation of public policy under

Morris v. Hartford Courant, 200 Conn. 676, 678-81(1986).

"[T]he public policy exception to the general rule allowing unfettered termination of an

at-will employment relationship is a narrow one[,] and [] courts should not lightly intervene to

impair the exercise of managerial discretion or to foment unwarranted litigation."  Burnham v.

Karl and Gelb, P.C., 252 Conn. 153, 165 (2000).  In any case, plaintiff's claim is precluded by

virtue of the existence of statutory remedies under Title VII, the CFEPA and the ADAAA.  See

id. at 159-60 ("The cases which have established a tort or contract remedy for employees

discharged for reasons violative of public policy have relied upon the fact that in the context of

their case the employee was *otherwise without remedy* and that permitting the discharge to go

unredressed would leave a valuable social policy to go unvindicated.") (emphasis original).

Accordingly, summary judgment will be granted in favor of defendant on plaintiff's stand-alone constructive discharge claim (Count VI).

### E.  Discrimination based on Disability under the ADAAA and the CFEPA

Plaintiff alleges that defendant discriminated against her based on her physical disability in violation of the ADAAA and the CFEPA (Counts II and V).

To make out a prima facie case under the ADA, a plaintiff must establish that (1) her employer is subject to the ADA; (2) she was disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered adverse employment action because of his disability. Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001).  See also Curry v. Allen S. Goodman, Inc., 286 Conn. 390, 426 (2008) (adopting similar standard under the CFEPA).  The definition of disability under the CFEPA is broader than under the ADAAA.  See Beason v. United Technologies Corp., 337 F.3d 271, 278 (2d Cir. 2003).

The ADAAA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).

Defendant argues that plaintiff has failed to establish that she is disabled as defined under the ADAAA and the CFEPA, as temporary impairments generally do not qualify.  See Palmieri v. City of Hartford, 947 F. Supp. 2d 187, 198-99 (D. Conn. 2013).  Plaintiff responds that she has offered sufficient medical evidence to establish that she was disabled in that she was medically prohibited from work on "repeated occasions," as well as restricted in work after being medically released back to Noah Webster.  Her medical records document three occasions (surgery and two

26

episodes of fainting at work) that necessitated medical leave.  The Court does not question the

legitimacy of plaintiff's medical issues or her need for leave.  Nevertheless, surgery for distinct,

unrelated medical issues accompanied by two fainting episodes does not amount to disability

under the ADAAA.

> [T]he Second Circuit has determined that, "A 'temporary impairment' lasting only
> a few months is, 'by itself, too short in duration ... to be substantially limiting.' " *De
> La Rosa v. Potter*, 427 Fed.Appx. 28, 29 (2d Cir. 2011) (quoting *Adams v. Citizens
> Advice Bureau*, 187 F.3d 315, 316–17 (2d Cir. 1999)). While this Circuit has
> explicitly deferred consideration of whether a temporary impairment is per se
> unprotected under the ADA (*see Adams*, 187 F.3d at 317), this Circuit has stated that
> an impairment of seven months, by itself, was too short to qualify as a disability. *See
> Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 646 (2d Cir. 1998) (superseded
> by statute on other grounds).

Id. at 198-99.

Here, plaintiff's impairments were relatively brief and she does not appear to suffer

residual limitations that substantially limit her ability to work or engage in other life activities.

Plaintiff does not contend that she is so limited, nor does she argue that she was regarded as

having such an impairment.  Rather, "[h]er disability began in August 2011 and . . . [h]er

physician permitted her to return to work in January 2012."  Pl.'s Mem. at 15 [ECF No. 52].

Plaintiff was "cleared to resume her work in full capacity" on July 19, 2012.

The CFEPA definition of physical disability is broader than the ADAAA definition

because it does not require that a plaintiff's impairment substantially limit major life activities.

See Beason, 337 F.3d at 278.  The CFEPA defines physical disability as "any chronic physical

handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic

processes or changes or from illness, including, but not limited to, epilepsy, deafness or hearing

impairment or reliance on a wheelchair or other remedial appliance or device[.]" Conn. Gen.

27

Stat. § 46a-51(15).  Although merely a summary order, the Second Circuit analyzed the meaning

of "chronic" under the CFEPA in Caruso v. Siemens Business Systs., Inc., 56 Fed. Appx. 536,

537 (2d Cir. 2003):

> The Connecticut Superior Court has defined "chronic" to mean "of long duration, or
> characterized by slowly progressive symptoms ... distinguished from acute." *Shaw
> v. Greenwich Anesthesiology Associates, P.C.*, 137 F.Supp.2d 48, 65 (D. Conn.2001)
> (citing *Gilman Bros. v. Conn. Comm'n on Human Rights & Opportunities*, CV
> 950536075, 1997 WL 275578, at *4 (Conn.Super.Ct. May 13, 1997)). This is
> consistent with the dictionary definition of "chronic," which provides: "Of diseases,
> etc.: Lasting a long time, long-continued, lingering, inveterate."* *Oxford English
> Dictionary* (2d ed.1989).

Id.

Fore example, in Gomez v. Laidlaw Transit, Inc., 455 F. Supp. 2d 81, 88 (D. Conn.

2006), the court held that a reasonable jury could find the employee's asthma to be chronic where

she had the asthma since childhood, exhibited severe symptoms during her tenure with her

employer, and continued to suffer at the time of litigation.  Id.  In contrast, although she required

significant medical leave, plaintiff's surgeries and fainting episodes were acute in nature and

caused by discrete events – some allegedly attributable to defendant.  Plaintiff has not argued or

demonstrated that her embolism or hysterectomy lead to other disabilities.She does not suffer a

chronic physical infirmity.  Rather, she had several serious medical events within a single school

year.  These conditions did not develop and worsen over time but appeared rapidly; they were

prototypical acute conditions that were resolved to the extent that plaintiff could work in full

capacity by the summer of 2012.  Accordingly, summary judgment will be granted in favor of

defendant on plaintiff's ADAAA and CFEPA disability discrimination claims.

### F.  Hostile Work Environment under the ADAAA

Likewise, summary judgment will be granted in favor of defendant on plaintiff's

ADAAA hostile work environment claim based on insufficient evidence of disability.

### G.  Retaliation under Title VII, the CFEPA

In order to establish a *prima facie* case of retaliation under Title VII, plaintiff must show

(1) that she participated in a protected activity, (2) that her participation was known to her

employer, (3) that her employer thereafter subjected her to a materially adverse employment

action, and (4) that there was a causal connection between the protected activity and the adverse

employment action.  See Kaytor v. Electric Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010).

Plaintiff must show that the retaliation was a "but-for" cause of the employer's adverse action.

Vega v. Hempstead Union Free School Dist., 801 F.3d 72, 90-91 (2d Cir. 2015).  CFEPA

retaliation claims follow a similar analysis.  Marini v. Costco Wholesale Corp., 64 F. Supp. 3d

317, 332 (D. Conn. 2014).

Defendant argues that plaintiff cannot satisfy the fourth element as to causal connection

between her protected activity and adverse employment actions.

At the summary judgment stage, once the employee demonstrates a minimal amount of

evidence to support the elements of the claim, the burden  shifts to the employer to proffer a

legitimate non-retaliatory reason for its actions.  If the employer produces such evidence, the

employee must, in order to avoid summary judgment, point to evidence sufficient to permit an

inference that the employer's proffered non-retaliatory reason is pretext for retaliation.  Id. at 552-

53.

First, plaintiff is only required to have a good faith, reasonable belief that she was

opposing an unlawful employment practice to have engaged in protective activity.  See
McMenemy v. City of Rochester, 241 F.3d 279, 285 (2d Cir. 2001).  "The law protects
employees in the filing of formal charges of discrimination as well as in the making of informal
protests of discrimination, including making  complaints to management[.]" Gregory v. Daly,
243 F.3d 687, 700-01.  Accordingly, plaintiff's alleged complaints made to assistant principal
Duke, if accepted, could qualify as protected activity.

Second, for a retaliation claim, retaliatory acts need not bear on the terms or conditions of
employment so long as the employer's actions could dissuade a reasonable employee from
making or supporting a charge of discrimination.  See Vogel v. CA, Inc., 2016 WL 6242916, at
*2 (2d Cir. October 25, 2016).  Moreover, "in determining whether conduct amounts to an
adverse employment action, the alleged acts of retaliation need to be considered both separately
and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as
to be actionable."  Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010).

The Court concludes that plaintiff's deposition testimony is sufficient to defeat summary
judgment on her retaliation claims.  See Kaytor, 609 F.3d at 554-55.  Indeed, plaintiff asserts that
in addition to enduring hostility and false accusations, she was misinformed about employment
and health coverage status, repeatedly reassigned, and eventually forced to seek medical
treatment as the tirade of unwarranted, public reprimands continued.  Despite receiving letters
from plaintiff's treating physicians concerning the allegedly hostile environment, defendant
allegedly ignored those medical reports.  There is evidence from which a rational fact finder
could infer that plaintiff's assignment to the newly created resource reading position was
effectively a demotion, and a jury could find, as did the Connecticut Employment Security

Appeals Division, that her eventual discharge was attributable to her employer.

Plaintiff has pointed to evidence sufficient to permit an inference that defendant's proffered non-retaliatory reasons are pretext for retaliation.

Finally, defendant contends that plaintiff's complaint neglected to allege retaliation under Title VII, but the first paragraph of plaintiff's second amended complaint alleges violations of Title VII "with respect to discrimination, hostile work environment and retaliation[.]" Accordingly, summary judgment will be denied as to plaintiff's sex based retaliation claims under Title VII and the CFEPA.

### H.  Punitive Damages against a Municipality under Title VII and the CFEPA

Plaintiff concedes that punitive damages are not permitted under Title VII and the CFEPA.

### CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment [ECF No. 43] is GRANTED in part and DENIED in part.  Summary judgment is granted as to plaintiff's claims of disability discrimination, retaliation, and hostile environment under the ADAAA and the CFEPA, and as to plaintiff's common law claim for constructive discharge and punitive damages.  All other claims remain.

Dated this 17th day of November, 2016, at Bridgeport, Connecticut.


  /s/Warren W. Eginton
WARREN W. EGINTON
SENIOR UNITED STATES DISTRICT JUDGE